# In the United States Court of Federal Claims

Nos. 24-1504C, 24-1505C, 24-1508C, 24-1529C, 24-1543C, 24-1596C, 24-1599C, 24-1653C, 24-1677C, 24-1678C, 24-1735C, 24-1760C, 24-1767C, 24-1764C, 24-1770C, 24-1771C, 24-1780C, 24-1798C, 24-1802C, 24-1803C, 24-1833C, 24-1840C, 24-1972C
Filed: September 30, 2026
Re-issued: October 13, 2026[1]

WESTWIND PARTNERS, LLP, et al.,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*,

CS GOVERNMENT SOLUTIONS, LLC, et al.,

*Defendant-Intervenors.*

**OPINION AND ORDER**

The Department of Homeland Security began this procurement for information technology services and equipment several years ago. At that time, the department wanted its own contract to ensure it would not have to compete with other agencies for contractors' attention on large, government-wide contracts and to avoid paying the fees associated with using such contracts. Things changed. In 2025, President Trump altered the procurement landscape with Executive Order 14240, which called for the transition of domestic procurements involving common goods and services to government-wide contract vehicles. Consequently, the department cancelled several of its department-specific procurements and contracts, including the FirstSource III procurement at issue here. Because compliance with the executive order is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, the court denies the Plaintiffs' motion for judgment on the administrative record and grants the Government's cross-motion for judgment on the administrative record.

[1] The court initially issued this opinion and order under seal and directed the parties to confer and propose redactions pursuant to the protective order. After conferring, the parties confirmed that no redactions are necessary. Accordingly, the court reissues the opinion in full.

## I. Background

### A. FirstSource III Solicitation

As discussed in *Westwind Partners, LLP v. United States*, No. 24-1504C, 2025 WL 985640 (Fed. Cl. Mar. 21, 2025), the Department of Homeland Security ("DHS") issued a Request for Proposals (the "RFP") in April 2021 for two parallel procurements. AR Tab 220a at 15963, 15977. The RFP, number 70RTAC21R00000003, was for a portion of the FirstSource III program that covered information technology goods and services, and was set aside for small businesses. FirstSource III was the third iteration of the program, designed to "provide commercially available IT commodities to DHS." AR Tab 405 at 37109. FirstSource III was designed to "build upon the success of its predecessors by providing more ordering benefits for IT commodities, solutions, and Value-Added Reseller (VAR) services." *Id.* DHS determined that an agency-specific procurement was best because government-wide contract vehicles would require additional feees and unnecessary competition for contractor attention. AR Tab 1 at 13–15. DHS anticipated awarding multiple indefinite delivery, indefinite quantity ("IDIQ") contracts as part of this program. AR Tab 220a at 15964.

Under the RFP, offerors could bid under two functional categories: the Information Technology Value Added Reseller ("ITVAR") category and/or the Software category. *Id.* at 15955. To be eligible, offerors had to fall into at least one of the following socioeconomic categories: Section 8(a), Historically Underutilized Business Zone, Service-Disabled Veteran-Owned Small Business, Women-Owned Small Business, and/or All Small Business. *Id.* This case concerns the ITVAR category.

For ITVAR services, DHS anticipated awarding IDIQ contracts to four to six businesses per socioeconomic category. *Id.* at 15958–59. These contracts were for five years with additional option periods. *Id.* at 15977. In total, DHS awarded thirty ITVAR IDIQ contracts. AR Tab 343a1 at 29871–73. Thirty unsuccessful vendors filed complaints in this court, seeking to permanently enjoin FirstSource III's ITVAR contract performance. These complaints were consolidated. ECF Nos. 14, 34, 35, 60, 67, 74, 86, 109, 119, 125, 143, 149.

### B. Executive Order 14240 and DHS Review

In March 2025, after these cases were pending, the President issued Executive Order 14240 titled "Eliminating Waste and Saving Taxpayer Dollars by Consolidating Procurement," which calls for "standardized procurement functions . . . carried out in the most efficient and effective manner possible for the American taxpayer." Exec. Order No. 14240, 90 Fed. Reg. 13671 § 1 (2025) ("E.O. 14240"). The order directs agencies to consolidate domestic procurements involving common goods and services under the General Services Administration ("GSA"). *Id.* The order also directs agency heads to submit proposals about how and where the GSA can "conduct domestic procurement with respect to common goods and services for the agency." *Id.* § 3(a). And the order calls for the Administrator to "rationalize Government-wide indefinite delivery contract vehicles for information technology for agencies across the



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

Government, including as part of identifying and eliminating contract duplication, redundancy, and other inefficiencies." *Id.* § 3(c).

On May 27, 2025, the court stayed proceedings in this case for sixty days while DHS considered how to implement E.O. 14240. *See* ECF No. 271 ("A stay of proceedings is warranted in this case to permit the Department of Homeland Security (DHS) to continue evaluating the impact of the Executive Order and to follow the order's directives."); *see also* ECF No. 272 (granting the motion to stay proceedings).

Pursuant to E.O. 14240, DHS officials reviewed the agency's portfolio and recommended the cancellation of several contracts and procurements—including FirstSource III. First, the DHS Strategic Solutions Office ("SSO") reviewed DHS's contract portfolio to determine each contract's mission criticality and whether cost avoidance or ceiling reduction was a possibility. AR Tab 409 at 37122–25. From this, SSO recommended the termination of eleven agency-wide contract vehicles, including FirstSource III. *Id.* at 37122–23.

Second, in a June 2025 memorandum, DHS's Chief Procurement Officer wrote that DHS was already "using other government-wide contracts with no negative impact to operations." AR Tab 404 at 37108. The memorandum also concludes that termination would result in "[a] total cost avoidance of $10 billion for FirstSource III." *Id.*

Ultimately, DHS's contracting officer decided to cancel the FirstSource III procurement and terminate the contracts for convenience. AR Tab 411 at 37131–32; AR Tab 412 at 37133–36.

In a separate memorandum, DHS's Office of the Chief Procurement Officer again explained that FirstSource III was redundant, writing that "the Department can readily obtain the products and services previously acquired through FirstSource contracts using existing government-wide contract solutions—such as NASA SEWP, CIO-CS3, and GSA Multiple Award Schedules." AR Tab 411 at 37129. This memorandum also provides that "DHS has successfully leveraged these alternatives in fulfilling IT requirements, while continuing to engage small businesses as appropriate," and that DHS has sustained "access to qualified vendors, enabling the Department to fulfill its mission needs quickly, efficiently, and cost-effectively." *Id.* The contracting officer echoed these conclusions. *Id.* at 37131–32.

Plaintiffs' second joint amended complaint alleges that E.O. 14240 does not "compel cancellation of this procurement" and "does *not* require GSA to eliminate *agency-specific* indefinity quantity, indefinite delivery contract vehicles." [2] ECF No. 286 ¶¶ 89. The amended

---

[2] All but six of the original plaintiffs joined the first amended complaint, and the court dismissed the complaints of those six plaintiffs. ECF Nos. 277–78. Subsequently, a seventh voluntarily dismissed its complaint. ECF No. 280. The court refers to the twenty-three remaining plaintiffs as the "Plaintiffs."



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

complaint also alleges that DHS improperly disregarded prior market research and misstated that cancellation would generate $10 billion in cost "savings." *Id.* ¶¶ 7–11, 84–86, 90–92.

## II. Jurisdiction and Standard of Review

This court has jurisdiction to hear a challenge to a contract award under 28 U.S.C. § 1491(b)(1). The court reviews agency procurement decisions under the standards of 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Among these standards is whether an agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Pursuant to this, an award may be set aside for "clear and prejudicial" violations of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). To establish prejudice, the plaintiff must show that there was a "substantial chance it would have received the contract award but for that error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).

The court may also set aside an award that lacks a rational basis. *Impresa Construzioni*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc.*, 19 F.3d at 1356). The court looks to "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* An agency's decision is typically arbitrary and capricious if the agency did any of the following: (1) relied on factors which Congress has not intended for it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) created a rule so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This means that an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Any party before this court "may move for partial or other judgment on the administrative record." Rules of the Court of Federal Claims ("RCFC") 52.1(c)(1). This rule is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Sparksoft Corp. v. United States*, 167 Fed. Cl. 694, 700 (2023) (citing *Bannum, Inc.*, 404 F.3d at 1354). Thus, "[i]n deciding cross-MJARs, this court considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on evidence in the record.'" *Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 132 (2025) (quoting *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020)).

## III. DHS rationally terminated FirstSource III.

### A. The record does not support the assertion that DHS cancelled FirstSource III because of this litigation.



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

The Plaintiffs believe that the reasons that DHS announced for cancelling FirstSource III were not the real reasons for the cancellation. They believe that "phantom cost savings" and this litigation were among the real reasons. *E.g.*, ECF No. 287 at 3–4. The court addresses the cost issues below, but easily disposes of the contention that DHS cancelled FirstSource III because the Plaintiffs were about to win this bid protest. Plaintiffs offer nothing more than the assertion that they had filed "meritorious" MJARs prior to the cancellation. But Plaintiffs immediately concede that the record "contains no evidence that DHS officials considered the merits of the protests when they decided to cancel this procurement." *Id.* at 4. Despite the lack of any evidence that DHS considered these cases, Plaintiffs invite the court to "consider the fact that the Plaintiffs were likely to succeed in this litigation when it considers whether to grant the requested relief of bid preparation and proposal costs." *Id.* The court declines the invitation. Because the record is devoid of any evidence that DHS considered this litigation when deciding to cancel FirstSource III, the court will not assume it did. Nor has the court ever concluded that Plaintiffs were likely to prevail based on their initial MJARs.

### B. E.O. 14240 provided a rational basis for the cancellation of FirstSource III.

Plaintiffs also contend that E.O. 14240 did not provide a rational basis for canceling FirstSource III because the E.O. "did not compel cancellation of this procurement" and did "not require GSA to eliminate *agency-specific* IDIQ contract vehicles." *Id.* at 21. While Plaintiffs are correct that E.O. 14240 did not compel the cancellation of this procurement, that is not the issue before the court. The question for the court is whether E.O. 14240 provides a rational basis for the cancellation of FirstSource III. It does.

E.O. 14240 seeks to consolidate purchasing common goods and services under GSA to avoid "hav[ing] multiple agencies and agency subcomponents separately carry out these same functions in an uncoordinated and less economical fashion." Exec. Order No. 14240 § 1. Thus, the order directs agency heads to submit proposals for how they will "have the General Services Administration conduct domestic procurement with respect to common goods and services for the agency, where permitted by law." *Id.* § 3(a). This order also permits the Government to rationalize contract terms more effectively. *See id*. § 3(c).

According to Plaintiffs, the executive order required only a "review"—not a cancellation—of contracts. *See* ECF No. 294 at 5. A review of agency contracts, however, cannot alone satisfy the call to consolidate and rationalize contracts. If an agency simply reviewed its contracts and nothing else, there would be no proposal submitted to the GSA Administrator and no action taken towards consolidation. To consolidate purchasing under the GSA, agencies will need to transition their purchasing away from their own unique contracts. Indeed, E.O. 14240 sets the Executive's policy of "eliminating contract duplication, redundancy, and other inefficiencies." Exec. Order No. 14240 § 3(c). That clearly contemplates cancellation.

Nor is there any basis in law to force the President to spell out every permissible (and impermissible) form of consolidation. Agencies and their contracting officers are in the best position to know which contracts are ripe for consolidation and how consolidation can best be effectuated. Again, "an agency must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.'" *State Farm*, 463 U.S. at 42 (citing *In re Permian*



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

*Basin Area Rate Cases*, 390 U.S. 747, 784 (1968)). Here, DHS personnel conducted several analyses in response to E.O. 14240, all of which came to the same conclusion: FirstSource III was ripe for consolidation.

It is also true that E.O. 14240 does not require agencies to eliminate all agency-specific IDIQ contract vehicles. Plaintiffs rightly recognize that "other agencies have continued with their own agency-specific IDIQ procurements for information technology, despite the E.O." ECF No. 294 at 5. But other agencies' actions are not before the court, and the court has no basis to pass on whether there is a rational basis for them to continue with their procurements. Here, DHS evaluated its existing procurements and determined, several times over, that FirstSource III was redundant and should be cancelled. If DHS cancelled FirstSource III and was left without any means of procuring IT equipment, the court would face a different question. *See, e.g., MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 543 (2011). But DHS merely transitioning from an agency-specific contract vehicle to government-wide contract vehicles does not raise such questions. In the end, DHS's approach can differ from other agencies' approaches so long as DHS's approach is rational. It is.

1. DHS reasonably concluded that the FirstSource III procurement was redundant.

In its cancellation notice on SAM.gov, DHS stated that FirstSource III "would provide redundant offerings available through existing General Services Administration (GSA) and other Government-wide solutions." AR Tab 412 at 37134. But Plaintiffs question how, "more than four years into this procurement, the agency allegedly determined, for the first time, that the procurement is redundant." ECF No. 287 at 2. While Plaintiffs may disagree with this decision being made a couple years down the line, that alone does not make the agency's decision irrational. And DHS explained clearly how it concluded that FirstSource III was redundant.

First, DHS explained that it could acquire IT equipment from a significant majority of the same suppliers through alternative contract vehicles—a clear indication of redundancy. Of the fifteen FirstSource III awardees,[3] DHS can contract with fourteen of them directly through other contract vehicles and with the fifteenth through joint ventures. AR Tab 410 at 37126–27; AR Tab 411 at 37129.[4] This supports DHS's redundancy conclusion was rational.

Second, DHS has had two years of experience using these other contract vehicles since FirstSource II's expiration in 2024. Because of a series of protests, DHS has not been able to use FirstSource III at all. AR Tab 411 at 37128–29. As a result, it has had to utilize other contract

[3] As stated above, DHS awarded 30 contracts. Because some awardees got multiple awards in different set-aside programs, there were 15 awardees of the 30 contracts. AR Tab 411 at 37128.

[4] After the cancellation decision, DHS also conducted a similar analysis of the Plaintiffs in this litigation. AR Tab 423 (although the analysis is undated, the AR index states the document was created in August 2025, roughly 2 months after the cancellation decision). Because this analysis was not before the contracting officer when she made her cancellation decision, the court does not consider it.



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

vehicles to procure IT equipment. As DHS explained, "since the expiration of the previous generation contract (FirstSource II) in September 2024, DHS has successfully utilized alternative government-wide small business solutions, such as NASA SEWP, to meet its needs without disrupting mission operations, even throughout this litigation." AR Tab 406 at 37114. Thus, DHS has real-world experience with these other contract vehicles and demonstrated that they can provide for all its needs.

In the end, DHS "shifted its acquisition strategy to align with E.O. 14240's mandate," and recognized that FirstSource III was redundant. ECF No. 292 at 11. This order fundamentally changed the procurement landscape for the federal government, and it required DHS to review its existing domestic procurements with an eye toward eliminating redundant contract vehicles. Indeed, E.O. 14240 specifically calls for "identifying and eliminating contract *duplication*, *redundancy*, and other inefficiencies." Exec. Order No. 14240 § 3(c) (emphasis added). Given the fact that DHS can contract with the FirstSource III awardees through other vehicles for IT equipment, DHS's determination that FirstSource III was redundant was rational.

While Plaintiffs may disagree with DHS's determination that FirstSource III is redundant, that alone does not make the decision arbitrary and capricious. As the agency properly considered the nature of the procurement, in addition to the resources and contractors available to the agency through government-wide contract vehicles, it rationally concluded that procuring IT equipment through an agency-specific vehicle was redundant. Given E.O. 14240's call to consolidate redundant procurements, DHS's decision to cancel FirstSource III is not arbitrary and capricious.

2. <u>DHS reasonably relied on current conditions to cancel FirstSource III.</u>

Relatedly, Plaintiffs fault DHS for not following its market research dating back to the launch of FirstSource III in 2020. At that time, DHS believed that an agency-specific contract was preferable, mostly because DHS wanted to have direct relationships with vendors and not have to compete with other agencies for vendors' attention on government-wide contract vehicles. AR Tab 1 at 13–15. Plaintiffs, however, ignore the material change in circumstance driving the procurement's cancellation: E.O. 14240.

While preparing for FirstSource III in 2020, DHS conducted market research to determine the best avenue for acquiring IT equipment. This research found that a DHS-specific contract would promote the agency's goals and "reduce acquisition lead-times," all the "while leveraging Department-wide buying power to obtain the lowest available prices." AR Tab 220a at 15963. The research also found that government-wide contract vehicles often have additional fees and create a need to compete for a contractor's attention. *Id.*; AR Tab 1 at 13–15. Thus, DHS determined that it would proceed with FirstSource III as an agency-specific contract because, "based on the history of FirstSource and FirstSource II, DHS expects to achieve significant cost reductions from leveraging its volume, favorable terms and conditions as well as process efficiencies." AR Tab 1 at 7.

Then, the President issued E.O. 14240. Pursuant to its direction to consolidate government purchasing, DHS reviewed existing domestic procurements and decided to cancel



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

FirstSource III. In doing so, DHS concluded that available government-wide contract vehicles would "ensure no critical gaps in vendor accessibility, minimizing the strategic reliance on FirstSource III as a standalone contract vehicle." AR Tab 406 at 37114. DHS also determined that a consolidated approach in line with E.O. 14240 "mitigates inefficiencies associated with redundant acquisitions, enables the Government to optimize its purchasing power, and enhances the standardization of procurement practices, thereby reducing acquisition lead times and facilitating a more efficient allocation of resources." AR Tab 411 at 37129.

Plaintiffs scoff at this, arguing that a departure from the 2020 market research contradicts *State Farm* by failing to consider an important aspect of the problem and providing an explanation counter to evidence before the agency. ECF No. 287 at 2 (citing *State Farm*, 463 U.S. at 43). If consolidation was the best option for the agency, then Plaintiffs contend this would have been discovered during the 2020 market research period, or in the years that followed. *Id.* ("[I]t is demonstrably incorrect that DHS has just detected, for the first time, that the products it sought to procure through FirstSource III may be available elsewhere."). According to Plaintiffs, nowhere in the record does DHS consider prior market research in making its cancellation decision. *Id.* And, consequently, nowhere in the record does DHS explain why it can depart from prior market research in making its cancellation decision. *Id.*

But the 2020 market research "does not reflect today's procurement landscape." ECF No. 292 at 13. And while Plaintiffs assert that the Government "does not explain this statement" and does not "provide a shred of evidence to support it," ECF No. 294 at 12, that does not ring true. Again, much of the 2020 market research focused on the convenience of DHS having its own contract vehicle to avoid competing with other agencies for vendor attention. That rationale was fine until E.O. 14240 changed procurement policy. And two years of successfully utilizing government-wide contract vehicles, as discussed in Section III.C, provides much more recent data on the suitability of the government-wide contract vehicles that DHS reasonably relied upon.

This is not to say that the market research from 2020 was incorrect. There are indeed fees associated with using government-wide contract vehicles. AR Tab 1 at 13–15. But additional fees are a DHS-specific concern; thus, the agency wanting to avoid such payments at the time made sense. But E.O. 14240 sets forth a full-government approach to improving efficiencies with common, government-wide contracts that take advantage of the entire federal government's greater market leverage. The President acted within his discretion when he changed the policy of the federal government to move towards centralized purchasing, and DHS rationally implemented that change. Even if Plaintiffs disagree with the President's chosen policy and the agency's resulting change in view, it was not arbitrary and capricious for DHS to follow the executive order and move its IT purchasing to existing government-wide contract vehicles rather than continuing with an agency-specific contract vehicle.

### C. The record does not reflect that the contracting officer considered cost savings or cost avoidance in making its cancellation decision.



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

Much of Plaintiffs' argument asserts that DHS's reliance on an "illusory" $10 billion of cost savings[5] was arbitrary and capricious. It is not disputed that DHS reported the entire ceiling value of FirstSource III as costs that would be avoided through the cancellation. Plaintiffs argue that DHS would not avoid $10 billion because they are still planning to purchase the same equipment through other contract vehicles, while the Government defends the figure based on the ceiling being a reasonable estimate of spending under FirstSource III. The Government Accountability Office agrees that DHS over reported its cost avoidance related to contract cancellations. U.S. GOV'T ACCOUNTABILITY OFF., GAO-26-109096, DHS CONTRACTS: REPORTED POTENTIAL COST AVOIDANCE FROM TERMINATIONS WILL NOT FULLY MATERIALIZE 2 (2026) (contained in ECF No. 300) ("This potential cost avoidance, however, is based on the maximum amount that DHS could have obligated on these contracts. It is unclear how much DHS would have actually obligated on these contracts if they had not been terminated, and thus, how much cost to the agency will actually be avoided."). The court need not resolve this issue, however, because the record does not indicate that the contracting officer considered cost avoidance when she determined that it was in the best interests of the United States to terminate the FirstSource III contracts and cancel the procurement.

Recall that following the issuance of E.O. 14240, DHS performed a series of analyses to comply with the order's directives. The Strategic Solutions Office ("SSO") reviewed all 66 of DHS's "strategic sourcing vehicles" to determine mission criticality and whether there were opportunities for cost avoidance. *See* AR Tab 409 at 37122–25. This analysis considered whether DHS could avoid certain costs through ceiling reductions or cancellations, and the PMO[6] agreed with some of the SSO conclusions, including with regard to cancelling FirstSource III. *Id.* at 37122–23.

About ten days later, the Strategic Programs Division of the Office of the Chief Procurement Officer (the "SPD") issued a memorandum recommending the cancellation of FirstSource III contracts. AR Tab 411 at 37128–30. This memo recited the changes flowing from E.O. 14240. It then states that DHS's review of existing contracts found that FirstSource III was redundant and did not align with E.O. 14240. *Id.* at 37129. The reasons for cancellation were:

- "[T]he Department can readily obtain the products and services previously acquired through FirstSource contracts using existing government-wide contract

[5] Throughout their briefing, Plaintiffs argue about the rationality of DHS's claimed cost "savings" while quoting references to cost "avoidance." *E.g.*, ECF No. 287 at 21. Of course, cost savings and cost avoidance are not the same thing. OMB Circular No. A-131 ¶¶ 6(c)–(d) (defining "cost savings" and "cost avoidance"). Because the resolution of this case does not depend on the distinction, the court refers to cost avoidance because that is what certain officials at DHS (other than the contracting officer) discussed.

[6] Nothing in the document defines the "PMO." The court assumes this refers to the Project Management Office.



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

solutions-such as NASA SEWP, CIO-CS3, and GSA Multiple Award Schedules." *Id.*

- "The analysis also revealed that during the current gap in FirstSource contracts, DHS has successfully leveraged these alternatives in fulfilling IT requirements, while continuing to engage small businesses as appropriate." *Id.*

- "Notably, of the 15 vendors awarded a FirstSource III contract, all but one are also available on either NASA SEWP or a GSA Multiple Award Schedule. However, this vendor is accessible through joint ventures and other potential contract solutions [sic] This strategic approach mitigates inefficiencies associated with redundant acquisitions, enables the Government to optimize its purchasing power, and enhances the standardization of procurement practices, thereby reducing acquisition lead times and facilitating a more efficient allocation of resources." *Id.*

Based on these three findings, the SPD recommended that the contracting officer terminate FirstSource III contracts because "[t]he contracts would provide redundant offerings available through existing GSA and other Government-wide solutions." *Id.* at 37130. Accepting this analysis and recommendations, the contracting officer concluded that the FirstSource III contracts should be terminated and the procurement cancelled. *Id.* at 37131. There is no indication that she considered cost avoidance when making her decision.

The contracting officer then posted a notice to SAM.gov, which announced the termination of the FirstSource III contracts and the termination of the solicitation. AR Tab 412 at 37133–36. After announcing the termination, the notice explains that:

> In alignment with recent Executive Orders, the Department conducted a thorough analysis of active contract awards and solicitations to assess mission criticality and continued needs. As a result of the analysis and findings, FirstSource Ill was determined to be a non-mission critical contract that would provide redundant offerings available through existing General Services Administration (GSA) and other Government-wide solutions. Therefore, in alignment with Executive Order 14240 "Eliminating Waste and Saving Taxpayer Dollars by Consolidating Procurement," which calls for the consolidation of Federal procurement for common goods and services under GSA solutions and the designation of GSA as the Executive Agent for Information Technology Contracts, the Department is taking action to terminate existing FirstSource Ill contracts and cancel the solicitation. The Department will continue to leverage existing GSA and government-wide contract solutions, such as NASA SEWP, for future IT requirements.

*Id.* at 37134–35. There is no mention of cost avoidance in this announcement either.



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**

None of this is to say that nobody at DHS was thinking about cost avoidance. The SSO and PMO considered the potential cost avoidance that would result from cancellations and ceiling reductions. AR Tab 409 at 37122–25. And they did conclude that cancellation would result in $10 billion of cost avoidance—the full contract ceiling for FirstSource III. That number may well be high. Similarly, the Chief Procurement Officer's memorandum to the Undersecretary for Management, which provided talking points and responses to frequent questions, discusses cost avoidance as a benefit of the cancellation. AR Tab 404–08. But here too the explanation for why DHS cancelled FirstSource III dealt with redundancy, not cost avoidance. AR Tab 406 at 37114. Finally, the record contains a series of emails between DHS and GSA officials about the terminations and potential cost avoidance. But there is no indication in the record that the contracting officer considered any cost avoidance when deciding to termination FirstSource III. Without evidence that the cost avoidance discussions ever reached the contracting officer or that she considered cost avoidance on her own, Plaintiffs' have failed to establish that illusory cost avoidance rendered her decision arbitrary or capricious.

In the end, the court concludes that DHS had a rational basis to cancel FirstSource III.[7] Because the challenged action was not arbitrary or capricious, bid and proposal costs are not awarded.

## IV. Conclusion

Therefore, the court **DENIES** Plaintiffs' motion for judgment on the administrative record, ECF No. 287. The court **DENIES** the United States' motion to dismiss in part as moot under Rule 12(b)(1) and **GRANTS** the United States' cross-motion for judgment on the administrative record, ECF No. 292. The Clerk's Office is directed to enter judgment accordingly. No costs.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge

[7] The Government contends that the finding of a rational basis would moot any challenge to proposal evaluations. ECF No. 292 at 16–17. Although mootness is not a good fit for this case, there is a much clearer route to the same conclusion. In the Second Amended Complaint, ECF No. 286, there is no claim regarding the proposal evaluations. Those counts were abandoned after the cancellation. All that remains in the Second Amended Complaint are the challenge to the rational basis of the cancellation and the request for bid and proposal costs. Thus, the result of the court's decision is that the entire protest has been resolved on the merits, not that part of it is now moot. To the extent that the Government moves to dismiss any portion of this case as moot under RCFC 12(b)(1), that motion is denied.



**Protected Information to be Disclosed Only in Accordance With the U.S. Courts of Federal Claims Protective Order**